1
2
3
4
5
6
7
8                 IN THE UNITED STATES DISTRICT COURT
9               FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   GLEN VIERRA,                          No C 05-02307 VRW
12               Plaintiff,
                                                     ORDER
13          v
14   MICHAEL J ASTRUE, Commissioner of
     Social Security,
15
                 Defendant.
16
     _____
17

18          Plaintiff Glen Vierra appeals from a determination by the
19   Social Security Administration (SSA) that he is not disabled and
20   accordingly not entitled to social security disability benefits.
21   The parties have filed cross motions for summary judgment.
22   Plaintiff in the alternative seeks remand.  The court now GRANTS
23   defendant Michael J Astrue's motion and DENIES plaintiff's motions.
24
25                                I
26                                A
27          Plaintiff was honorably discharged from the military in
28   1975 then worked as a shipbuilder and welder until late 2002.  AR

**United States District Court**
For the Northern District of California

1  72, 83, 173.  Plaintiff injured his back while working in 1989 and

2  thereafter began to suffer panic attacks.  AR 62, 172.  Whether

3  this injury caused plaintiff to miss work for any length of time is

4  unclear from the record, although he visited both

5  acupuncturist/chiropractor Dr Dennis L Greenlee for his back (AR

6  74) and psychiatrist Dr Frederick Whipple for his panic attacks

7  until 1990.  AR 73, 172.  Plaintiff hired counsel in pursuit of his

8  worker's compensation claims for these injuries in 1991.  AR 75.

9  There is no indication that plaintiff sought any treatment for his

10  back after 1990 despite injuring it again in 2000.  AR 62.

11          In 1997, plaintiff was diagnosed with hepatitis C during

12  a life insurance evaluation and underwent a liver biopsy, the

13  results of which are not included in the record.  AR 169, 176.

14  Plaintiff claims that during the ensuing years the hepatitis C made

15  him so ill that he was "just dragging [him]self to work, and just

16  barely making it [sic]."  AR 211.

17          In February 2002, plaintiff's regular physician, Dr Bruce

18  N Tucker, ordered both lab tests and an abdominal ultrasound scan.

19  AR 138, 165-66.  Lab tests showed elevated aspartate and alanine

20  aminotransferase levels but normal albumin and bilirubin levels

21  (symptoms consistent with hepatitis C), as well as an elevated alpha

22  feto protein level, sometimes a symptom of primary liver cancer.  AR

23  165-66; Mark H Beers, MD, ed, The Merck Manual of Diagnosis and

24  Therapy, 18th ed (Merck Research Laboratories, 2006), Hepatic and

25  Biliary Disorders at "Chronic Hepatitis" and "Primary Liver Cancer,"

26  online at http://www.merck.com/mmpe/sec03.html (visited March 22,

27  2007).  Plaintiff's abdominal ultrasound scan,

28  //

2

used to detect structural abnormalities such as tumors, was "unremarkable."  AR 138; Beers, <u>Merck Manual</u> at "Imaging Tests."

Around March 2002, plaintiff was referred to Dr Roy Musick, a gastroenterologist.  AR 132, 161.  Dr Musick ordered a liver biopsy which showed "chronic hepatitis," "2+ stainable iron" and no evidence of malignancy.  AR 135.  Lab tests showed hepatitis C in copies/ml (the viral titer) at 1,060,180.  AR 162.

In July 2002, Dr Musick ordered an abdominal computed tomograhy (CT) scan, used to detect tumors, ascites and diffuse disorders such as iron overload.  AR 131; Beers, <u>Merck Manual</u> at "Imaging Tests."  Plaintiff's liver appeared "normal."  AR 131.

Dr Musick began to treat plaintiff's hepatitis C with pegalated interferon and ribavirin in late October 2002.  AR 130-32. Plaintiff reported that he stopped working shortly thereafter due to the side effects of the treatment (AR 71) which included:  feeling ill for two to three days after each injection (AR 214); seeing double while welding (AR 130); difficulty concentrating; difficulty driving; weakness; and pain.  AR 210.  Plaintiff also complained of fatigue, but by September and October 2003, plaintiff reported "slightly less fatigue," and "feeling well [with] more energy."  AR 122-29.

Plaintiff, however, did not return to work upon completion of the treatment because "the virus came back."  AR 215.  Beginning in November 2003, plaintiff's viral titer steadily increased, reaching 4,160,000 by April 2004.  AR 141, 201.

During the course of the treatment, Dr Musick noted in his file that plaintiff might have an iron storage disorder and referred him to Dr Thomas S Stanton, oncologist and hemotologist.  AR 125,

3

169.  Although Dr Stanton concluded that plaintiff suffered from "hyperferritinemia," he explained that it was likely due to the liver disease but that the liver biopsy results were most accurate, and plaintiff's were "normal."  AR 170.  Dr Stanton did not recommend treatment.  Id.

Plaintiff saw Dr David A Charp, his family doctor, from January 2003 to early August 2004.  AR 199-200.  What can be deciphered of Dr Charp's notes mostly reflect plaintiff's subjective complaints of lower back pain, his hepatitis C treatment and viral load and the progress of his application for Social Security disability benefits.  Id.  There is no indication in the record that Dr Charp treated plaintiff for these complaints.

In August 2004, Dr Musick provided a letter to SSA stating that plaintiff's viral titer indicated that he was a "non-responder" to the interferon treatment whose "major symptoms are fatigue and low back pain" and that he was disabled.  AR 201.  Dr Musick noted having referred plaintiff to the University of California Hepatology Program but there are no records from that facility in the record.  Id.

B

On August 28, 2003, plaintiff applied to the SSA for disability benefits alleging inability to work due to chronic hepatitis C and a herniated disk.  AR 13, 71.  Plaintiff wrote that he could no longer "work hard," was slower, needed more rest and was "weak, sick, and in pain."  AR 71, 82.

Plaintiff nonetheless reported performing numerous daily activities including:  dressing, bathing and cooking except that

4

United States District Court
For the Northern District of California

"[he] start[ed] the morning with dry bread and water to get the strength to cook"; walking up to one mile two to three days per week which made him "feel better"; lifting things around the house; performing housework such as vacuuming and dishes; driving; working in the yard; and walking the dog.  AR 80-81.  Plaintiff admitted, "if I can get enough rest [and] good diet good food I do ok [sic]." AR 80.  Plaintiff listed interferon as his only medication, although Dr Musick's notes refer to plaintiff's use of medical marijuana, both prescribed and "street purchased," as early as July 8, 2003. AR 82, 124.

Because plaintiff reported a history of panic attacks, SSA sent him to psychiatrist Dr Emily Toch for a comprehensive evaluation on December 18, 2003.  AR 172.  Dr Toch's report listed plaintiff's complaints, including dizziness, difficulty concentrating and some depression and anxiety, but also noted plaintiff's broad range of activities, such as watching television, exercising, playing sports, doing volunteer work delivering groceries and reading.  AR 172-73.  Dr Toch diagnosed a depressive disorder but concluded that the "claimant is fully functional" and assessed a score of 65 for plaintiff on the Global Assessment of Functioning Scale, which corresponds to generally good functioning. AR 175, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th ed, (Washington DC, American Psychiatric Association, 2000), 34.

The SSA also sent plaintiff to Dr Benjamin Fritz for a comprehensive internal medicine examination, conducted on January 22, 2004.  AR 176.  Dr Fritz noted that he had no records to review but took down a detailed verbal history from plaintiff, who

mentioned his depressive symptoms, dizziness and arthritis —— all of which he attributed to his hepatitis C and related treatment.  Id. Dr Fritz concluded that plaintiff could stand and walk for an unrestricted period during an eight-hour day, lift or carry twenty pounds occasionally and ten pounds frequently, might need to limit bending, stooping or crouching due to his balance difficulties, but was subject to no other workplace limitations.  AR 179.

On February 22, 2004, based on the consultative examiners' reports, the SSA rejected plaintiff's application.  AR 22.  Soon after, plaintiff requested reconsideration and filed a notice of appointment of representative, attorney Candace C Davenport.  AR 33, 34, 100.

Plaintiff's request alleged nothing new about his condition except that the "virus is back in my blood" and that he was experiencing more pain and resting more.  AR 100, 104.  On April 13, 2004, having reviewed new reports from Drs Charp and Musick per plaintiff's request, the SSA again rejected plaintiff's application. AR 28.  Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ).  AR 35.

On forms plaintiff completed in April and May of 2004, he noted no change in his daily activities and acknowledged that he could "take care of [him]self" and used medical marijuana for his ailments.  AR 93, 97, 109.  Plaintiff claimed, however, that his condition had changed because of a "bad" blood test administered in April 2004.  AR 96, 107.  Plaintiff may have been referring to a blood test noted in Dr Musick's letter, referred to supra, which showed a significantly higher viral titer.  AR 201.
//

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In May 2004, the SSA requested from plaintiff's

2 representative additional evidence for the ALJ's consideration,

3 offering assistance if needed.  AR 36.  In July 2004, plaintiff

4 appointed attorney Patrick Kelly as his representative, who obtained

5 Dr Charp's clinical notes and Dr Musick's letter.  AR 41, 198-201.

6    The hearing before the ALJ took place on October 28, 2004.

7 Plaintiff described his medical and employment history, AR 207-28,

8 then testified that prior to November 2002, when he stopped working,

9 he had lacked energy due to the hepatitis C.  AR 208-09, 211.

10 Plaintiff described the debilitating side effects of the interferon,

11 saying he thought "it was going to kill me."  AR 214-15.  Plaintiff

12 reported that the increase in his viral titer caused him weakness,

13 difficulty concentrating, fatigue and a need for "constant

14 nourishment."  AR 217.  Plaintiff also reported flu-like symptoms

15 related to his iron storage problems and enfeebling pain from his

16 disk disease.  AR 218-20.  Plaintiff testified that "my liver

17 prevents me from taking a lot * * * of pain medication," but that

18 medical marijuana made it possible for him to eat, rest and "calm

19 down."  Id.  Finally, plaintiff testified that "UCSF" had

20 recommended another liver biopsy to ascertain the degree of

21 degeneration in his condition.  AR 216.

22    Plaintiff testified that he did volunteer work on

23 Friday afternoons for over two hours delivering groceries, adding

24 "[i]t makes me feel better."  AR 221.  Plaintiff testified that

25 he otherwise rested, watched TV, used the internet for half-hour

26 periods, visited the library, read newspapers and walked.  AR

27 221-22.

28 \\

The Vocational Expert (VE) analyzed plaintiff's work history then answered the following hypothetical question:

> Let's assume we have an individual of [plaintiff's] age, vocational and educational background. Let's assume he can perform at the light level of exertion with the following limitations: he should be limited to occasional bending, stooping, or crouching and * * * simple repetitive work * * * . It does not require a great amount of concentration. Would there be any job in the regional or national economy such a person could perform?

AR 224. The VE responded with three possible vocations: (1) cashier II, with a specific vocational preparation (SVP) level of 2, of which there were 3,500,000 in the national economy and 144,000 in California; (2) counter rental clerk, with an SVP level of 3, of which there were 450,000 nationally and 59,000 in California; and (3) office helper, with an SVP level of 2, of which there were 150,000 nationally and 25,000 in California. AR 225-26.

The ALJ found that plaintiff's impairments were "severe" within the meaning of the regulations but that he retained the residual functional capacity (RFC) to perform light work modified to accommodate his postural and concentration limitations. AR 15, 18. The ALJ relied on the consultative examiners' conclusions and plaintiff's testimony regarding his daily activities. AR 15-16.

The ALJ gave no weight to Dr Musick's conclusion that plaintiff is disabled, noting that "disability" is a finding reserved to the SSA and Dr Musick's definition of "disability" was unclear. AR 16. The ALJ noted that Dr Musick cited no grounds for his conclusion except symptoms that were neither quantified nor related to functional limitations and included pain in plaintiff's back which Dr Musick had not examined. Id. Finally, the ALJ noted

**United States District Court**
For the Northern District of California

the inconsistency between Dr Musick's opinion and Dr Fritz's conclusion that plaintiff could perform light work.  Id.

The ALJ determined that plaintiff was unable to perform his past relevant work and was limited to light work.  He also determined that plaintiff's allegations of complete disability were "not fully credible when viewed in light of the entirety of the evidence of record."  Id.  The ALJ emphasized and underscored plaintiff's numerous daily activities, his lack of side effects from medications and his failure to seek treatment for his back pain. Id.  Finally, the ALJ concluded that plaintiff was "capable of making a successful adjustment to work that exists in significant numbers in the national economy" and was not disabled as defined by 20 CFR § 404.1520(g).  AR 17.

In January 2005, plaintiff sought review by the SSA Appeals Council.  AR 9.  In a handwritten letter, plaintiff asserted that his hepatitis C would result in his death and caused him confusion and weakness which prevented him from working or living independently, saying, "I have to make myself eat and I make myself walk to try to stay strong enough to keep living! [sic]."  AR 204. He claimed that he sought no treatment for his back because he had exhausted all treatment options and reported that the "UCSF liver clinic" had told him he needed a new liver and another liver biopsy to determine the extent of liver damage.  Id.  As noted earlier, the record contains no documentation of any visits to this facility.

The Appeals Council denied the request for review.  AR 5-7.  Plaintiff then filed the instant action seeking judicial review. \\
\\

United States District Court
For the Northern District of California

II

The court's jurisdiction is limited to determining whether the SSA's denial of benefits is supported by substantial evidence in the administrative record.  42 USC § 405(g).  A district court may overturn a decision to deny benefits only if the decision is not supported by substantial evidence or if the decision is based on legal error.  See Andrews v Shalala, 53 F3d 1035, 1039 (9th Cir 1995); Magallanes v Bowen, 881 F2d 747, 750 (9th Cir 1989).  The Ninth Circuit defines "substantial evidence" as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F3d at 1039.  Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ.  See id; Magallanes, 881 F2d at 750.

III

A

"Disabled" is defined as "unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 CFR § 404.1527.

To determine whether a claimant is disabled and entitled to benefits, the SSA conducts a five-step sequential inquiry.  20 CFR § 404.1520; 20 CFR § 416.920.  Under the first step, the ALJ considers whether the claimant is currently employed in substantial gainful activity.  If not, the second step examines whether the

10

claimant has a "severe impairment" that significantly affects his or her ability to conduct basic work activities.  In step three, the ALJ determines whether the claimant has a condition which "meets" or "equals" the conditions outlined in the Listing of Impairments in 20 CFR Part 404, Subpart P, Appendix 1.  20 CFR § 404.1520.  If the claimant does not have such a condition, step four asks whether the claimant can perform her past relevant work.  If not, in step five, the ALJ considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy.  20 CFR §§ 404.1520(b)-(f); §§ 404.920(b)-(f).

A claimant may be found "not disabled" at any step in the five-step evaluation process; a claimant may be found "disabled" only at steps three or five.  20 CFR § 404.1520(a)(4), 20 CFR § 416.920(a)(4).  The claimant bears the burden of proof at steps one through four.  Bustamante v Massanari, 262 F3d 949, 953-54 (9th Cir 2001) (citing Tackett v Apfel, 180 F3d 1094, 1098 (9th Cir 1999)).  At step five, the burden of proof shifts to the SSA.  Id; see also Brown v Apfel, 192 F3d 493 (5th Cir 1999) ("This shifting of the burden of proof [] is neither statutory nor regulatory, but instead, originates from judicial practices.").  If a plaintiff reaches step five, the SSA has the burden of proving that there are jobs in the national economy that plaintiff can perform.  Oyen v Shalala, 865 F Supp 497, 504 (D Ill 1994).

To determine whether a claimant is disabled the SSA must consider all symptoms, such as pain and fatigue.  20 CFR 404.1529(a).  Once plaintiff has established a medically determinable impairment that could reasonably produce the asserted symptoms "the adjudicator may not discredit the claimant's

United States District Court
For the Northern District of California

allegations of the severity of pain solely on the ground that the allegations are unsupported by objective medical evidence." <u>Bunnel v Sullivan</u>, 947 F2d 341, 343 (9th Cir 1991); 20 CFR 404.1529(b-c). But the adjudicator may make specific findings supporting a conclusion that the claimant's allegations of the severity of symptoms are not credible and discount the allegations accordingly. Id at 345. Examples of such specific findings include evidence that the claimant engages in daily activities transferrable to the workplace, unexplained failure to seek treatment and ordinary techniques of credibility evaluation. 20 CFR 404.1529(c)(3); SSR 96-7; see also <u>Burch v Barnhart</u>, 400 F3d 676, 680 (9th Cir 2005).

The SSA distinguishes among the opinions of treating physicians and non-treating examining physicians. 20 CFR 404.1527(d). As a general rule, more weight should be given to the opinion of a treating source than a non-treating one. Id. If a treating physician's opinion differs with that of a non-treating examining physician "it is then solely the province of the ALJ to resolve the conflict." <u>Andrews</u> 53 F3d at 1041 (citing <u>Magallanes</u>, 881 F2d at 751). The ALJ must, however, provide "specific and legitimate reasons" for rejecting the treating physician's opinion. <u>Murray v Heckler</u>, 722 F2d 499, 502 (9th Cir 1983).

The SSA will re-contact medical sources or provide consultative examinations when the medical evidence provided by a treating physician is insufficient to support a determination. 20 CFR 416.912(e). "[T]he ALJ has a special duty to fully and fairly develop the record." <u>Smolen v Chater</u>, 80 F3d 1273, 1288 (9th Cir 1996).

//

United States District Court
For the Northern District of California

1    Under the regulations, the opinion that a claimant is
2 disabled is deemed not a "medical opinion" but, as the ultimate
3 issue, is reserved to the SSA.  20 CFR 416.927(e).  When a physician
4 opines that a claimant is disabled, the SSA will review all of the
5 evidence that supports that statement will independently determine
6 whether the claimant is disabled.  Id.  It is the SSA's policy to
7 make every reasonable effort to re-contact the physician for
8 clarification if the bases of such an opinion are unknown to the
9 ALJ.  SSR 96-5.

10    At step five, the SSA may use either the Medical
11 Vocational Guidelines at 20 CFR Part 404 Subpart P Appendix 2, the
12 services of a VE or the Dictionary of Occupational Titles (DOT) to
13 determine whether jobs that the claimant can perform exist in the
14 national economy in substantial numbers.  Osenbrock v Apfel, 240 F3d
15 1157, 1162-63 (9th Cir 2001) (citations omitted); see also 20 CFR
16 404.1566(d-e).  But when the claimant has significant non-exertional
17 impairments, such as pain, fatigue or difficulty concentrating, the
18 ALJ cannot rely on the guidelines.  Osenbrock 240 F3d at 1162-63.
19 When there is a conflict between the VE's testimony and the DOT the
20 ALJ may rely on the VE's testimony only if the record contains
21 persuasive evidence to support the deviation.  Johnson v Shalala, 60
22 F3d 1428, 1435 (9th Cir 1995)

23

24                                  B

25    In support of his motion plaintiff contends that:  (1)
26 substantial evidence does not support the ALJ's finding that
27 plaintiff's alleged limitations are not fully credible; (2) the ALJ
28 erred by not developing the record fully and by giving credence to

13

United States District Court
For the Northern District of California

Dr Fritz's opinion over Dr Musick's; and (3) the SSA failed to carry its burden in step five of the evaluation because the hypothetical posed to the VE was inadequate and the vocations proffered by the VE had reasoning levels outside plaintiff's capacity.  The court disagrees with each of these contentions.

1

Plaintiff contends that the ALJ's evaluation of plaintiff's credibility is not supported by substantial evidence. Doc #30 at 7-13.  The court disagrees.

The ALJ documented numerous reasons for determining that plaintiff was not credible, such as the evidence that plaintiff: lived independently; reported no disabling side effects from medications; did housework and yard work; did volunteer work delivering food; and took walks and went to the library.  AR 15-16. The ALJ also allowed for many of plaintiff's subjective complaints in the RFC.  AR 16.

Plaintiff asserts numerous alternative readings of each asserted piece of evidence relied on by the ALJ in his credibility determination.  Doc #30 at 9-10.  But when, as here, the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision.  Andrews, 53 F3d at 1039-40.  Thus, plaintiff's alternative interpretations of the evidence are irrelevant.

Plaintiff points to no additional evidence in the record that would counter-weigh that cited by the ALJ.  The court, moreover, has carefully examined the record and found none. Plaintiff suggests that the record contains "strong" objective

14

medical evidence of fatigue and pain, but the record only contains plaintiff's subjective complaints to his doctors and his own testimony.  AR 82, 125-28, 217.  The ALJ may consider a claimant's lack of credibility when evaluating a physician's opinion based on the claimant's own reports of his symptoms.  Andrews, 53 F3d at 1043.  The ALJ properly discredited plaintiff's reports of his symptoms and, accordingly, was not required to accept medical opinions based on those reports.

Plaintiff points out that the ALJ disregarded evidence of detrimental side effects from interferon; plaintiff's treatment, however, ceased in October 2003 along with any side effects.

Plaintiff further asserts that the ALJ erred by inserting his own observations of plaintiff at the hearing in the credibility determination.  Doc #30 at 11-12.  Plaintiff relies on Perminter v Heckler, 765 F2d 870, 872 (9th Cir 1985).  Perminter is inapposite here because the ALJ's observations in that case were the sole basis for the credibility determination.  Nothing in Perminter prevents the ALJ from relying on observations in addition to other substantial evidence in assessing plaintiff's credibility.  Contrary to plaintiff's position, "[t]he inclusion of the ALJ's personal observations does not render the decision improper."  Nyman v Heckler, 779 F2d 528, 531 (9th Cir 1985).  Accordingly, it was not error for the ALJ to note that plaintiff "exhibited no stress during the 30 minute hearing" where other substantial evidence supported the credibility assessment.  AR 16.

//

//

//

15

**2**

Plaintiff asserts that the ALJ had a duty to ascertain the bases for Dr Musick's opinion before rejecting it.  Doc #30 at 14-16.  Plaintiff further contends that the ALJ applied the wrong legal standard for rejecting a treating physician's opinion and that Dr Fritz's opinion did not constitute substantial evidence to support the determination that plaintiff was not disabled.  Id at 16-18.

Citing SSR 96-5, plaintiff argues that the ALJ "did not know how Dr Musick came to his conclusion" and was therefore required to supplement the record by re-contacting Dr Musick for clarification.  The court reads the ALJ's opinion differently.  The ALJ noted that "Dr Musick provides no grounds for his opinion except to cite the claimant's diagnosis of hepatitis C and his symptoms of fatigue and chronic back pain," (AR 16) ⸺ that is, Dr Musick neither related the bases for his opinion to functional limitations, nor defined his understanding of the term "disabled."  Id.  Here, the administrative record already contained copies of all the records of plaintiff's treating relationship with Dr Musick.  The ALJ, simply put, found no support for Dr Musick's conclusion in the bases he relied on.  "The ALJ need not accept a treating physician's opinion which is brief and conclusionary in form with little in the way of clinical findings to support its conclusion" and may consider plaintiff's lack of credibility in assessing an opinion based on plaintiff's claims.  <u>Magallanes</u>, 881 F2d at 751; <u>Andrews</u>, 53 F3d at 1040.  Dr Musick's opinion was brief and conclusory and relied on plaintiff's subjective complaints of fatigue and pain.  AR 16.  And, though more weight is given to the opinion of a specialist on issues related to his or her area of specialty, Dr Musick's cited bases are

**16**

not within his area of specialty.   <u>Andrews</u>, 53 F3d at 1042 n 4
(citing 20 CFR 416.927(d)(5)).

     Moreover, the SSA made numerous efforts to help plaintiff,
was represented by counsel, develop the medical evidence.   The SSA
sent letters to plaintiff's identified medical sources, obtained
comprehensive medical and psychological examinations and offered to
help obtain evidence.   AR 36-37, 112-21, 172-84.   Additionally,
plaintiff's counsel obtained supplemental reports from Drs Charp and
Musick later in the proceeding.   AR 198, 201.

     Although the duty to develop the record fully exists
whether or not a plaintiff is represented by counsel, the facts of
this case are not comparable to cases in which the Ninth Circuit has
found that the ALJ failed in his or her duty to develop the record
fully.   See, e g, <u>Celaya v Halter</u>, 332 F3d 1177 (9th Cir 2003)(ALJ
erred by not developing medical record when illiterate and
unrepresented claimant may not have known that she could assert
obesity as partial basis of her disability); <u>Higbee v Sullivan</u>, 975
F2d 558 (9th Cir 1992)(ALJ had a duty to develop record when
unrepresented and mentally ill claimant's testimony was sole basis
for decision); <u>Smolen v Chater</u>, 80 F3d 1273 (9th Cir 1996)(ALJ erred
in rejecting physician's opinion for failure to list bases of
opinion when the opinion was uncontroverted and corroborated).
Here, plaintiff was represented by counsel, was offered help by the
SSA in obtaining medical evidence, underwent consultative exams, and
claimed no mental impairment that would prevent his understanding of
the proceedings.

//

//

17

United States District Court

For the Northern District of California

Finally, the opinion of the consultative examiner, Dr Fritz, could properly serve as substantial evidence (Andrews, 53 F3d at 1041) if based on independent clinical findings, as it was.  See Magallanes, 881 F2d at 751.  Whether Dr Fritz asked the patient about fatigue is irrelevant since the ALJ could reject any portion of Dr Fritz's report that was based on plaintiff's subjective complaints, having already properly discredited them.

3

Turning to plaintiff's challenges to step five, in which the SSA must demonstrate the existence of other work which a claimant can perform, plaintiff asserts that:  (1) the hypothetical question was faulty because it excluded plaintiff's subjective complaints; (2) he is incapable of performing the semi-skilled job of counter rental clerk offered by the VE; and (3) the reasoning levels listed in the DOT for the jobs identified by the VE are incompatible with his concentration limitation.  Doc #30 at 18-23.  Plaintiff also points out that the VE gave the wrong call number for the cashier II vocation during the hearing; this, however, was harmless error, since the VE used the correct job title and the ALJ referred to the correct vocation in his decision.  Id at 21.

The ALJ's hypothetical was sufficiently complete.  AR 224.  An ALJ may limit evidence included in a hypothetical, particularly properly-rejected allegations of subjective symptoms, as long as the assumed facts are supported by the record.  Magallanes, 881 F2d at 756; See also, Rollins v Massanari, 261 F3d 853, 857 (9th Cir 2001).  Here, the VE was asked to identify "simple and repetitive" work which accounts for some, but not all, of plaintiff's subjective

18

United States District Court

For the Northern District of California

complaints.  AR 224.  The ALJ was not required to include
discredited complaints of pain and fatigue in the hypothetical.

Plaintiff correctly asserts that the counter rental clerk
vocation is not properly included in the ALJ's finding.  Because the
ALJ found that the skills from plaintiff's prior job were not
transferable, only "unskilled" jobs, listed in the DOT as SVP 1 or
2, would be suitable.  AR 17; Terry v Sullivan, 903 F2d 1273, 1276-
77 (9th Cir 1990); 20 CFR 404.1568; SSR 00-4.  The counter rental
clerk job corresponds to an SVP of 3.  Dictionary of Occupational
Titles, 4th Ed, revised 1991, s v 279.357-054.  The error is
harmless, however, because the VE identified two other jobs that
exist in significant numbers that plaintiff can perform.  See Barker
v Secretary of Health and Human Services, 882 F2d 1474, 1479 (9th
Cir 1989)(holding that 1,266 jobs constitutes a significant number).
"A decision of the ALJ will not be reversed for errors that are
harmless."  Burch, 400 F3d at 679.

Plaintiff claims that the cashier II and office helper
jobs identified by the VE do not account for the concentration
requirement included in the hypothetical question.  In support,
plaintiff refers to the "reasoning levels" specified in the DOT
which describe each vocation's requirement for understanding and
carrying out different forms of instructions and dealing with
problems with different amounts of concrete variables.  See
Dictionary of Occupational Titles, s v 211.462-010 and 239.567-010.

It is the SSA's policy that the testimony of a VE should
be consistent with the information contained in the DOT but can
include information not listed in the DOT.  SSR 00-4.  The VE's
description of the proffered jobs as "simple and repetitive" does

19

United States District Court
For the Northern District of California

1   not necessarily conflict with the reasoning levels listed in the

2   DOT; these do not refer specifically to concentration or a worker's

3   ability to focus but to a standard definition of reasoning:  "the

4   process by which one judgement is deduced from another or others

5   which are given."  The Oxford English Dictionary Online, 2d ed, s v

6   "reasoning," online at http://dictionary.oed.com (visited March 19,

7   2007).  Although there may be some correlation between concentration

8   and reasoning, the reasoning levels listed in the DOT do not control

9   the concentration limitation specified in the hypothetical question.

10  The ALJ was precluded from applying the guidelines due to

11  plaintiff's non-exertional impairments yet concentration

12  requirements are not listed in the DOT.  Tackett, 180 F3d at 1101.

13  Thus, the ALJ was correct to rely on the VE to determine which jobs

14  could accommodate plaintiff's non-exertional impairments, such as

15  his concentration limitation.  Even if the reasoning level 3 job,

16  cashier II, were excluded, moreover, the ALJ's disposition would

17  still stand since the level 2 office helper job would remain an

18  option.  See Barker, 882 F2d at 1479.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

20

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV

The ALJ's decision was supported by substantial evidence in the record as a whole and was based on correct legal principles. For the foregoing reasons, the court affirms the ALJ's decision to deny benefits.  Accordingly, the court DENIES plaintiff's motion for summary judgment (Doc #27) and GRANTS defendant's motion for summary judgment (Doc #25).

The clerk is directed to enter judgment in favor of the defendant and against plaintiff and to terminate all pending motions.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge